

**FILED**

Nov 08 2017, 9:16 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANTS

Richard A. Smikle
Jenny R. Buchheit
Andrew J. Miroff
Steven R. Latterell
Ice Miller, LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES

Allyson R. Breeden
Jean M. Blanton
Molly E. Briles
Ziemer Stayman Weitzel &
Shoulders, LLP
Evansville, Indiana

Jeffrey B. Kolb
Charles E. Traylor
Kolb Roellgen & Kirchoff, LLP
Vincennes, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Guardianship of Darvin Henry Lamey, An Adult

Raymond L. Lamey and Ramona Lamey, Co-Guardians of the Person of Darvin Henry Lamey and Co-Personal Representatives of the Estate of Darvin Henry Lamey,

*Appellants-Respondents,*

v.

November 8, 2017

Court of Appeals Case No. 26A01-1703-GU-588

Appeal from the Gibson Circuit Court

The Honorable S. Brent Almon, Special Judge

Trial Court Cause No. 26C01-1408-GU-21

Ziemer, Stayman, Weitzel &
Shoulders, LLP and Kolb
Roellgen & Kirchoff, LLP,

*Appellees-Petitioners.*

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellants-Respondents, Raymond L. Lamey, M.D. (Raymond) and Ramona Lamey (Mona) (collectively, Appellants), Co-Guardians of the Person of Darvin Henry Lamey and Co-Personal Representatives of the Estate of Darvin Henry Lamey, appeal the trial court's findings of fact and conclusions of law granting the payment of attorney fees to Appellees-Petitioners, Ziemer, Stayman, Weitzel & Shoulders, LLP (ZSWS) and Kolb Roellgen & Kichoff, LLP (Kolb), incurred during their representation of the protected person.

We affirm.

## ISSUES

Appellants present this court with two issues on appeal, which we restate as follows:

(1) Whether the trial court properly granted payment of attorney fees to ZSWS when ZSWS entered into an attorney-client relationship with Darvin Henry Lamey (Darvin) while Darvin was a protected person and under a

guardianship, and entered into this relationship without the knowledge of Darvin's Guardian *ad Litem* (GAL) and without contracting with the guardian of his estate; and

(2) Whether the trial court properly granted payment of attorney fees to Kolb when Kolb entered into an attorney-client relationship with Darvin, without the knowledge of Darvin's GAL, and without contracting with the guardian of his estate, for purposes of modifying Darvin's estate plan and making an election under the Virginia Lamey Trust.

[4] ZSWS and Kolb present this court with two issues on appeal, which we restate as:

(1) Whether Appellants can bring this interlocutory appeal of right even though Appellants were not ordered to pay any amount of money; and

(2) Whether ZSWS and Kolb are entitled to appellate attorney fees pursuant to Indiana Appellate Rule 66(E).

[5] In addition, Kolb presents this court with one issue on appeal, which we restate as: Whether Appellants have standing to pursue this appeal.

## FACTS AND PROCEDURAL HISTORY

[6] A lifelong farmer with significant business acumen, Darvin accumulated substantial wealth in real estate and personal property during his lifetime. In the summer of 2014, Darvin was nearly 87 years old and resided at River Point Health Campus in Evansville, Indiana. He had been diagnosed with

degenerative dementia, an enlarging abdominal aortic aneurysm, and was hospitalized for a knee infection. On June 23, 2014, Darvin's son, Raymond, an anesthesiologist in Evansville Indiana, petitioned and obtained a temporary appointment as a guardian over Darvin after Raymond became concerned his father could no longer make "informed decisions concerning his health." (Transcript, Jan. 2016, p. 200). At Darvin's request, the trial court appointed a Guardian *ad Litem* (GAL) to periodically prepare reports and make recommendations to the trial court.

[7]     Prior to the guardianship, Darvin relied on a female friend and companion (Darvin's Friend) to take him to his medical appointments and help take care of his basic needs and financial affairs. After being appointed as guardian, Raymond discovered large sums of money missing from Darvin's accounts. He was also contacted by staff at River Point with concerns for Darvin's safety, based on Darvin's Friend's means of transportation and disregard for Darvin's high risk for falling. As a result, Raymond obtained an *ex parte* order of protection against Darvin's Friend.

[8]     On August 8, 2014, Raymond filed his petition for appointment of guardian over Darvin's person and estate. Even though the GAL reported that Darvin objected to the appointment of Raymond as his guardian and the GAL expressed a concern that Raymond would not be willing or able to meet Darvin's emotional needs, the trial court appointed Raymond as guardian on September 18, 2014, due to Darvin's "degenerative dementia and general mental decline under Indiana law." (Appellant's Conf. App. Vol. II, p. 64). To

abate the GAL's concerns, the trial court instituted some limitations to Raymond's guardianship, in pertinent part, as:

> 5. The guardian shall allow reasonable visitation of the ward by friends and family. Further, the guardian shall provide visitation with his two favorite dogs at least weekly. The guardian shall ensure that the monthly social security payments go into the guardianship account and from that $500.00 be placed into a separate account for the use and benefit of the ward.

> 6. The prior Order requiring the ward to remain at River Point Nursing home is hereby lifted and the guardian may place the ward at University Nursing home, or another suitable facility.

(Appellant's Conf. App. Vol. II, p. 65).

[9] On November 26, 2014, the GAL filed a report with the trial court detailing recent meetings and communications with Darvin. Commenting on Darvin's health, the GAL reported a "decline in Darvin['s] mental status, specifically his memory and escalation of anger and frustration[.]" (Appellant's Conf. App. Vol. II, p. 67). She observed that as Darvin's mental health declines, he "becomes more vocal, paranoid and angry over the circumstances he has found himself." (Appellant's Conf. App. Vol. II, p. 67). The GAL detailed Darvin's numerous apprehensions regarding Raymond's behavior as his guardian, as well as her investigations into his concerns, and concluded that "there is no evidence to support that [Raymond] is not meeting Darvin's needs." (Appellant's Conf. App. Vol. II, p. 71). Although "Darvin tells everyone who will listen to him that [Raymond] is stealing his money, mishandling his assets

and not showing him the documentation," and despite the fact that the GAL herself had "shown Darvin the evidence that [Raymond] is not stealing his money[,] . . . Darvin refuse[d] to believe it." (Appellant's Conf. App. Vol. II, p. 71). "Darvin has accused the [GAL] of being on [Raymond's] side despite being shown the bank records." (Appellant's Conf. App. Vol. II, p. 71). The GAL twice alerted the trial court in her report that one of Darvin's friends, Charlie Schmitt, had contacted her regarding Raymond's perceived mishandling of Darvin's money and alleged refusal to produce the appropriate documentation. Subsequently, in January 2015, the trial court authorized the removal of the limitations on the guardianship and authorized Darvin's placement in a more secure nursing home facility.

[10] In mid-January of 2015, ZSWS became aware that Darvin was seeking counsel to terminate Raymond's guardianship over his person and estate. ZSWS gathered information from collateral sources and attempted to meet with Darvin prior to entering its appearance but Raymond prevented ZSWS from consulting with Darvin. On February 17, 2015, ZSWS filed its appearance and several emergency motions with the trial court seeking access to Darvin, as well as a petition to terminate the guardianship. The trial court granted ZSWS's emergency motions on April 7, 2015. On March 31, 2015, the GAL filed an additional report with the trial court, reporting that Darvin had been moved to the West River Health Campus' Legacy Unit and alerting the court that:

> When [Darvin's Friend] and Charlie Schmitt visit, Darvin's
> frustration intensified and he cannot be redirected. Staff reported
> the Schmitt's [sic] have conversations with Darvin regarding

court. Staff has had to tell Darvin to stop talking in front of the other residents. Staff reported on a scale of 1 to 10, with one (1) being a normal day, Darvin's frustration level reaches an eight (8) after the Schmitt's [sic] leave. Staff reported they witness an obvious change in Darvin's demeanor on Monday after the Schmitt's [sic] have visited over the weekend. Staff reported it takes a couple of days to calm Darvin. Staff reported Darvin will also have a list of questions or things he wants taken care of by [Raymond] or staff after the Schmitt's [sic] have visited.

(Appellant's Conf. App. Vol. II, p. 101). The GAL explicitly noted her

ongoing concerns regarding the number of people who are attempting to micromanage and interfere in [Darvin's] life based on their own value system and presumptions of what is in his best interest. The GAL questions the motivating factors of the individuals given Darvin's considerable assets. The GAL read a letter written by [Darvin] in which he offers $100,000 to any Evansville attorney who "takes Guardianship + Power attorney from [Raymond].

(Appellant's Conf. App. Vol. II, p. 103). On August 18, 2015, the trial court struck Darvin's petition to terminate the guardianship and denied his emergency motions to replace Raymond as a guardian.

[11] Darvin, via ZSWS, appealed the trial court's order striking his petition to terminate the guardianship. Due to Darvin's life expectancy, which at that time was six to nine months, we granted an expedited appeal. On December 15, 2015, this court suspended consideration of the appeal and ordered the trial court to conduct a full evidentiary hearing within thirty days of the order addressing "(1) whether Darvin is incapacitated; (2) what limitations shall be

placed on any guardian's powers; (3) what is the least-restrictive placement appropriate for Darvin's care; and (4) who is the best family member or other person to serve as Darvin's guardian given the obvious animosity and estrangement between Darvin and [Raymond]." (Appellant's App. Vol. III, p. 23).

Pursuant to the Court of Appeal's order, on January 4 through January 7, 2016, the trial court conducted an evidentiary hearing. At the conclusion of the fourth day of testimony, the parties presented the trial court with an Agreed Order of Limited Guardianship (Agreed Order), representing their jointly negotiated resolution of all pending matters. The Agreed Order was signed by the trial court on January 8, 2016, and stipulated, in pertinent part:

1. [Darvin] is an incapacitated person due to his inability to manage in whole or in part his property and/or to provide self-care.

2. The welfare of Darvin would be best served by limiting the scope of the guardianship pursuant to Indiana Code section 29-3-5-3(b) in order to encourage development of Darvin's self-improvement, self-reliance, and independence; and contribute to Darvin's living as normal a life as Darvin's condition and circumstances permit without psychological or physical harm to Darvin.

3. Darvin's son, [Raymond], is hereby replaced as guardian over Darvin's estate by German American Bank (the "Bank Trustee") effective immediately subject to the requirement for [Raymond] to provide the [c]ourt with a final accounting of

the guardianship estate in accordance with the Indiana Code section 29-3-9-6. . . .

* * * *

5.  The [c]ourt hereby appoints the Bank Trustee to serve as guardian over Darvin's estate. The Bank Trustee shall allow Darvin to provide input into the business and financial decisions of the estate. The Bank Trustee shall allow Darvin to review his bank and other account statements and business records on a monthly basis and upon reasonable request by Darvin. The Bank Trustee shall also allow [Raymond] and Mona to review the same statements and records on a quarterly basis. No counsel of record in this matter will represent the Bank Trustee in any representative capacity involving these parties. The Bank Trustee will distribute to Darvin $2,000 per month for his personal use with the manner of distribution thereof to be determined in the Bank Trustee's discretion.

* * * *

8.  [Raymond] and Darvin's daughter, Mona, are hereby appointed co-guardians over Darvin's person with their power limited to the ability to consent to medical or other professional care and treatment for Darvin's health and welfare. [Raymond] and Mona shall allow Darvin to provide input into decisions involving his medical and other professional care and treatment.

* * * *

11.  Darvin shall have unrestricted access to visitors of his choosing unless an order of the court is issued to the contrary after Darvin is given notice and an opportunity to be heard.

Family members shall be allowed reasonable private visitation with Darvin.

* * * *

15. Darvin shall have unrestricted access to counsel of his choosing during the pendency of the guardianship.

16. If Darvin desires to make any change to this trust or estate plan(s) or to make an election under Virginia Lamey's Trust, a hearing must first be held in front of Judge Meade in the Gibson Circuit Court and be subject to approval by the [c]ourt. Such hearing will be given docket priority after notice to counsel for all parties. This provision does not limit the Bank Trustee's power under Indiana Code section 23-3-9-4.5.

(Appellant's App. Vol. III, pp. 25-28).

[13] On April 29, 2016, Raymond filed a motion to intervene in the guardianship proceedings in his capacity as the Successor-Trustee of the Revocable Declaration of Trust Agreement of Darvin H. Lamey, dated September 3, 1997 (Darvin's Trust), for the purpose of collaborating with the guardian of Darvin's estate, German American Bank (GAB), to transfer certain parcels of real estate and items of personal property into Darvin's Trust, consistent with Darvin's then-existing estate plan, and in order to avoid the probate process. At the same time, Raymond, in his capacity of Successor-Trustee, filed a petition for the execution of the estate plan on behalf of Darvin, seeking to execute the estate plan and to request a hearing pursuant to Paragraph 16 of the Agreed Order. The trial court set the matter for a hearing on May 6, 2016.

[14] On May 5, 2016, after meeting with Darvin, ZSWS met with Kolb to explore a possible consultation and evaluation of Darvin in order to determine his testamentary capacity, and to prepare new estate planning documents according to Darvin's wishes. During the scheduled hearing of May 6, 2016, ZSWS moved for a continuance and advised the trial court that Darvin intended to make changes to his estate plan and would file a petition with the court shortly. The trial court granted Raymond's motion to intervene, took Raymond's estate plan petition under advisement, and reaffirmed the scheduling of a contested hearing on May 20, 2016, on all remaining pending matters. On May 13 and 16, 2016, respectively, Kolb consulted with Darvin, after which Kolb concluded that Darvin possessed testamentary capacity and that Darvin intended to include certain gifts in a revised estate plan. On May 16, 2016, ZSWS filed the Darvin estate plan petition, advising the trial court that Darvin anticipated to amend his estate plan and to exercise his power of appointment under the Virginia Lamey Trust. The petition sought an expedited hearing with docket priority on the issue of testamentary capacity pursuant to Paragraph 16 of the Agreed Order, and as such, requested the trial court to hear the petition at the already scheduled hearing of May 20, 2016. Raymond objected to the expedited hearing and requested additional time to address the issue of Darvin's testamentary capacity.

[15] During the proceedings on May 20, 2016, the trial court denied Darvin's request for an expedited hearing and set the matter for a hearing on June 21, 2016. However, the trial court granted the GAL's request that any proposed

changes to Darvin's estate plan be disclosed to the GAL so that she could "determine if the changes are in Darvin's best interest or if Darvin [] has been unduly influenced to make said changes." (Appellant's App. Vol. III, p. 50). The trial court ordered Kolb to provide the GAL with a copy of the current draft of Darvin's revised estate plan, over Darvin's objection.

[16] Meanwhile, both parties engaged expert witnesses to evaluate Darvin's testamentary capacity. Raymond engaged Jeffrey Gray, Ph.D., a neuropsychologist, and Juan Cabrera, M.D., while ZSWS retained Nicole Werner, Ph.D., a forensic psychologist, and Alan Felthous, M.D. (Dr. Felthous), a forensic psychiatrist, both located in St. Louis, Missouri. Although initially Raymond attempted to prevent Darvin from leaving the nursing home to travel to St. Louis for evaluation with ZSWS's experts, after consultation between the parties and Judge Meade on June 8, 2017, an agreement was reached and, that same day, Darvin met with Dr. Felthous. On June 13, 2016, Darvin was deposed. Based on Darvin's testimony at the deposition, the GAL expressed her "great concern about [Darvin's] testamentary capacity and possibility of undue influence to Darvin's counsel":

1. [Darvin] stated that he was unsure and need it proven to him that the Virginia Lamey Trust even exists. I am baffled that a motion for power of appointment under the Virginia Lamey Trust could be requested when the person seeking such appointment does not know if the Trust exists.

2. [Darvin] had no recollection of [Kolb], meeting with [Kolb] or having [Kolb] prepare the estate planning documents. This

was in spike [sic] of you leading the witness by asking, "Darvin, don't you recall going to Vincennes to meet with an attorney to do your estate planning?" [Darvin's] response was, "No."

3. [Darvin] testified that he did not know what changes he wanted to make to his Will and/or Trust, that he would have to think it over and would need to talk to [Darvin's Friend] as to what she wanted from his estate. This is a far cry from the documents provided by [Kolb] at the last hearing. At the last hearing, you requested that the court allow [Darvin] to execute the documents prepared by [Kolb] in case the court ruled in his favor on his testamentary capacity. This morning, you advised that [Kolb's] documents were only a draft. I am confused by the representations at our last hearing and the representations in our telephone conversation. The two positions are wholly inconsistent.

(Appellant's App. Vol. III, pp. 99-100). Based on these apprehensions, the GAL advised the parties that she would "oppose any estate planning on [Darvin's] part" as well as "oppose any attorney's fees that are incurred after [Darvin's] deposition." (Appellant's App. Vol. III, p. 100).

[17] On June 30, 2016, after the June 21st hearing was continued, Darvin filed an emergency motion, requesting to set aside Paragraph 16 of the Agreed Order which would enable him to proceed with executing estate planning documents because his health continued to decline. The trial court did not set a hearing on Darvin's motion. On July 15, 2016, Kolb met with Darvin to review and revise his estate planning documents. Darvin executed a Superseding Will and

Superseding Trust Amendment, which diverted benefits from his family to various philanthropic institutions.[1]

[18] On August 29 and 30, 2016, the trial court conducted a hearing on Darvin's testamentary capacity, during which both Dr. Werner and Dr. Felthous testified over the co-guardians' objections. On both days, Kolb waited to testify, but was never called to the stand. Darvin did not attend the hearing due to his deteriorating health. At the close of the second day, the hearing was recessed and continued to September 23, 2016, without the trial court making a determination on Darvin's testamentary capacity, or a decision on the estate planning petitions or the application of Paragraph 16 of the Agreed Order. Darvin passed away on September 1, 2016.

[19] On September 8, 2016, ZSWS filed its fee petition,[2] seeking payment from the Guardianship Estate of those fees and expenses involved in establishing Darvin's testamentary capacity: $95,693.25 in attorneys' fees, $960.78 in expenses, and $14,006.42 in advanced costs, as well as a $10,575.00 invoice from Dr. Werner. The following day, Kolb submitted its fee petition in the amount of $15,959.80. On October 18, 2016, over Raymond's and Mona's objections, the trial court ordered GAB to pay ZSWS $86,718.25 in attorneys'

---

[1] A related will contest is pending in the Gibson Circuit Court.

[2] This is ZSWS's second fee petition in the Guardianship Estate. Its first fee petition, which is not part of this appeal and which covered its fees to contest Raymond's guardianship over Darvin, were ordered to be paid in full by the trial court on March 8, 2016. *See* Appellee's App. Vol. III, p. 79.

fees, $778.26 in expenses, and $14,006.24 in advanced costs. The trial court also ordered GAB to pay Dr. Werner's invoice in full.

[20] Subsequently, on October 7, 2016, ZSWS filed its verified petition for payment of Dr. Felthous' incurred fees, in the sum of $42,882.96. It also filed a motion to correct errors, seeking to collect the unpaid $8,975.00 in fees and $182.50 in expenses from its original fee petition. After the original trial judge recused himself, the special judge set the motion to correct error, the Felthous fee petition and Kolb's fee petition for hearing on February 20, 2017. After a contested hearing, the trial court issued its Findings of Fact and Conclusions regarding Certain Claims,[3] granting ZSWS's fee petition and ordering the payment of Dr. Felthous' invoice and the partial payment of Kolb's fee petition.

[21] Appellants now appeal. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

[22] For a thorough understanding and a proper framework to situate these proceedings, it merits reiterating that at this point in time, the guardianship proceedings—even as the protected person has passed away—are conducted side-by-side with the estate proceedings. Although legally, the guardianship terminates upon death and an estate is opened, due to the current dispute, the

---

[3] We would be remiss in not mentioning the detailed and thorough nature of the special judge's findings of fact and conclusions of law in this matter.

guardianship has yet to close and the case at bar is posited squarely within its province.

[23] However, before we can address the merits of Appellants' appeal, we must evaluate the threshold jurisdictional issues advanced by ZSWS and Kolb. Advocating that Appellants have neither standing nor the right to bring this interlocutory appeal, ZSWS and Kolb urge this court to dismiss this cause.

## I. *Standing*

[24] Contending that Appellants have no standing to pursue this appeal either as the co-guardians of Darvin's person or as the co-personal representatives of Darvin's estate, Kolb claims that Appellants cannot contest the trial court's order on attorney fees and the award on expert witness fees and invites us to dismiss this appeal.

[25] Standing is a fundamental, threshold, constitutional issue that must be addressed by this, or any, court to determine if it should exercise jurisdiction in the particular case before it. *Alexander v. PSB Lending Corp.*, 800 N.E.2d 984, 989 (Ind. Ct. App. 2003), *trans. denied*. To have standing, a party's "interest 'must be a present, substantial interest, as distinguished from a mere expectancy or future contingency interest.'" *Inlow v. Henderson, daily, Withrow & DeVoe*, 787 N.E.2d 385, 395 (Ind. Ct. App. 2003), *reh'g denied, trans. denied* (citing 59 Am. Jur. 2d *Parties* § 37, at 442 (2002)).

[26] Darvin died on September 1, 2016. Upon his passing, the guardianship ended and an estate was opened. At that point, Raymond and Mona became the co-personal representatives of Darvin's estate and received the remaining property of the guardianship into the estate. *See* I.C. § 29-3-12-1(e) ("When a guardianship terminates by reason of the death of the protected person, the powers of the guardian cease, except that the guardian may pay the expenses of administration that are approved by the court . . . and may deliver the remaining property for which the guardian is responsible to the protected person's personal representative."). On December 23, 2016, GAB filed its final accounting to wind down the guardianship estate. *See* I.C. § 29-3-9-6(a) (explains the duty of the guardian to file a written verified account of the guardian's administration after the termination of the appointment). While GAB was compiling its final accounting and prior to filing its report with the trial court, ZSWS and Kolb submitted petitions for the payment of their fees and the payment of Dr. Felthous' expert witness fee with the guardianship estate. On January 18, 2017, Appellants, as co-personal representatives of Darvin's estate, filed their appearance in the guardianship proceedings and objected to the payment of the respective fee petitions. When GAB filed its accounting and attempted to close the guardianship estate, ZSWS and Kolb objected on the basis that the guardianship could not be closed while the remaining fee claims were outstanding. On January 20, 2017, all parties, including Appellants in their capacity as co-personal representatives of the estate, appeared for a telephonic conference with the trial court. During this

hearing, the parties agreed that all fee contestations would be heard in the guardianship proceedings and not in the estate proceedings.

[27] Although expectant heirs have only a future and contingent interest in the assets of the estate, here, by virtue of the timing of Darvin's death, Appellants received a present and substantial interest in the estate's assets on September 1, 2017. *See* I.C. § 29-1-7-23; *Inlow*, 787 N.E.2d at 395. As the assets of the guardianship must pass into the estate, Appellants, as co-personal representatives of the estate, had an actual and substantive interest in the possible decline of the guardianship assets and thus had standing to oppose the payment of the fee petitions in the guardianship proceedings upon Darvin's death.

[28] Nevertheless, Kolb now contends that Appellants lack standing as co-personal representatives of the estate because they omitted to file a motion to intervene in that capacity. Focusing on this court's decision in *Simon v. Simon*, 957 N.E.2d 980 (Ind. Ct. App. 2011), and our supreme court's ruling in *Old Nat'l Bancorp v. Hanover College*, 15 N.E.2d 574, 576-79 (Ind. 2014), Kolb maintains that the filing of a motion to intervene is "fundamental to maintaining order and certainty in trial court cases regarding true parties of record" and the lack thereof is fatal to acquiring standing. (Kolb Br. p. 11).

[29] In *Simon*, a removed trustee and personal representative attempted to appeal an order denying a motion to recuse. *Simon*, 957 N.E.2d at 982. She brought the appeal in her personal representative capacity. *Id*. at 983. We dismissed for

lack of jurisdiction, because we found that "[s]he is no longer the Personal Representative or Trustee and, therefore, she cannot litigate on behalf of the Estate or the Trust in a capacity she no longer occupies." *Id*. at 989-99. Rejecting appellant's argument that she could maintain the appeal in her individual capacity as a beneficiary of the trust and estate, this court noted that appellant "did not move to intervene in her individual capacity in the trial court," nor did she "bring this appeal in her individual capacity." *Id*. at 989-90.

[30] Similarly, in *Hanover*, Old National served as trustee over two trusts, both of which benefitted Hanover College. *Old Nat'l Bancorp.*, 15 N.E.3d at 575. After the trial court granted Hanover's request to terminate the trusts, Old National did not seek a stay of the order; instead, it appealed the order in its capacity as trustee. *Id*. Hanover moved to dismiss the appeal, arguing lack of standing as the trial court's order had been effectuated and Hanover's status as trustee had ended. *Id*. In response, Old National claimed to pursue the appeal in its individual capacity as a bank. *Id*. Rejecting Old National's argument, the supreme court determined that Old National had clearly appealed in its capacity as the trustee of the terminated trusts—a capacity it no longer possessed. *Id*. at 577. At the same time, the court refused to consider Hanover's argument, which relied on *Simon* and which claimed that "to gain standing in its individual capacity, Old National must have first intervened at the trial court and its failure to do so is fatal to its claim of standing as an individual." *Id*. Noting that Old National neither intervened, nor appeared in its individual capacity before the trial court, the supreme court dismissed the

appeal for lack of standing, referring extensively to Old National's repeated mentioning of its status as trustee in its appellate briefing (rather than its individual status), and paid its attorney fees from the trust assets. *Id*. at 577-78.

[31]    While Appellants concede that they did not file a formal motion to intervene in accordance with Indiana Trial Rule 24(C), in *Old Nat'l Bancorp*, our supreme court explicitly refused to consider whether such a motion was required and instead focused on other factors, such as the party's appearance below and its appellate representations in determining standing. Unlike the appellant in *Simon* and *Old Nat'l Bancorp*, Appellants here intervened before the trial court in their capacity of co-personal representatives of Darvin's estate. During the trial court's proceedings, neither ZSWS nor Kolb objected to the Appellants' participation in the guardianship in that matter, and the trial court treated Appellants as intervening parties. Throughout the appellate proceedings, Appellants have consistently referred to themselves in their capacity of co-personal representatives of the estate. If, in light of the specific circumstances before us, we were now to require the actual filing of a motion to intervene to acquire standing, we would be elevating form over substance. Accordingly, Appellants have standing to appeal the trial court's order in their status of co-personal representatives of Darvin's estate.

## II. *Interlocutory Appeal*

[32]     In a related argument, ZSWS and Kolb contend that this appeal should be dismissed because Appellants cannot bring an interlocutory appeal of right when they were not ordered to pay money.

[33]     The appellate authority of this court is "generally limited to appeals from final judgments." *Ball State University v. Irons*, 27 N.E.3d 717, 720 (Ind. 2015). However, our Rules of Appellate Procedure also confer appellate jurisdiction over non-final interlocutory appeals pursuant to Appellate Rule 14. There are three ways a case may proceed as an interlocutory appeal: an interlocutory appeal of right pursuant to Appellate Rule 14(A); a discretionary interlocutory appeal, as provided in Appellate Rule 14(B); or an interlocutory appeal from an order granting or denying class-action certification in accordance with Appellate Rule 14(C). Appellants assert that their appeal was properly brought as an interlocutory appeal of right under Appellate Rule 14(A)(1), which provides, in relevant part:

> A. Interlocutory Appeals of Right. Appeals from the following interlocutory orders are taken as a matter of right by conventionally filing a Notice of Appeal with the Clerk within thirty (30) days after the notation of the interlocutory order in the Chronological Case Summary:
>
> (1) For the payment of money;

In general, the matters appealable of right pursuant to Appellate Rule 14(A) are those which carry financial and legal consequences akin to those typically found in a final judgment. *Bacon v. Bacon*, 877 N.E.2d 801, 805 (Ind. Ct. App.

2007), *reh'g denied, trans. denied*. Because the trial court mandated GAB, as representative of Darvin's guardianship estate, to pay the approved attorney fees and expert witness fees, ZSWS and Kolb argue that Appellants were not ordered to pay any sums of money in their capacities as the co-personal representatives of Darvin's estate and therefore cannot now pursue an interlocutory appeal of right.

[34]     However, even though GAB was ordered to pay the fees, the remainder of the guardian estate must be transferred into Darvin's estate. As Darvin was deceased at the time of the Order, the amount payable from the assets in the guardianship immediately impacts the amount delivered into the estate of which Appellants are the co-personal representatives. *See* I.C. § 29-3-12-1(e). Accordingly, as the Appellants have an interest in the amount that is to be paid in response to ZSWS's and Kolb's fee petitions, they are entitled to pursue an interlocutory appeal of right.

### III. *Attorney fees*

[35]     Turning to the merits of their appeal, Appellants contend that the trial court erred in awarding attorney fees to ZSWS and Kolb and in ordering the payment of the expert witness fees. We review the trial court's award of attorney fees for an abuse of discretion. *See* I.C. § 29-3-2-4; *In re Guardianship of Hickman*, 811 N.E.2d 843, 851 (Ind. Ct. App. 2004), *trans. denied*. An abuse of discretion occurs only if the judgment is against the logic and effect of the facts and

circumstances before the court, together with any reasonable inferences arising therefrom. *Hickman*, 811 N.E.2d at 851.

[36] Pursuant to Indiana Code section 29-3-9-9:

> (a) Whenever a guardian is appointed for an incapacitated person or minor, the guardian shall pay all expenses of the proceeding, including reasonable medical, professional, and attorney's fees, out of the property of the protected person.

> (b) The expenses of any other proceeding under this article that results in a benefit to the protected person or the protected person's property shall be paid from the protected person's property as approved by the court.

The right to compensation from the guardianship estate "should not depend upon the result of the litigation but rather upon the reasonable necessity for such litigation." *In re Guardianship of N.R.*, 26 N.E.3d 97, 100 (Ind. Ct. App. 2015). Thus, when ruling on an attorney fee petition in a guardianship proceeding, the trial court should consider not only the outcome of the proceedings but also "(1) whether the parties acted reasonably and in good faith incurring the fees, (2) whether the facts were in dispute, (3) whether the legal issues were complex, and (4) whether any party's misconduct caused the proceedings." *Id.*

### A. ZSWS & Dr. Felthous

[37] Appellants contend that the trial court abused its discretion when it granted payment of ZSWS's fees and Dr. Felthous' expert witness fees.[4] Focusing on the provision of the Agreed Order that gave Darvin the right to choose his own counsel, they import the distinction that a right to choose does not encompass the right to hire counsel, which belonged to GAB, as "ultimate decisionmaker on behalf of the" guardianship estate. (Appellants' Br. p. 31). Because ZSWS omitted to contract with GAB to provide services to Darvin, Appellants claim that they are not entitled to reimbursement. Moreover, only contesting ZSWS's fees incurred in its involvement to change Darvin's estate plan and establish his testamentary capacity, Appellants point out that these fees and expenses are not necessary services which benefit the guardianship proceedings.

[38] Indiana law allows for the appointment of a guardian to act in the best interest of a person who is unable to care for himself or for his property. *Estate of Prickett v. Womersley*, 905 N.E.2d 1008, 1010 (Ind. Ct. App. 2009). In general, a guardian of a protected person "is responsible for the incapacitated person's care and custody and for the preservation of the incapacitated person's property to the extent ordered by the court." I.C. § 29-3-8-1(b). As such, a court has discretion to "limit the scope of a guardianship by restricting the responsibilities and powers a guardian would otherwise have under the Guardianship Code." I.C. § 29-3-5-3(b). Availing themselves of this provision, the parties, as affirmed

---

[4] Appellants do not object to the payment of fees incurred by ZSWS to challenge and terminate the guardianship.

by the trial court, established certain boundaries to the guardianship and determined in the Agreed Order that:

> 15. Darvin shall have unrestricted access to counsel of his choosing during the pendency of the guardianship.

> 16. If Darvin desires to make any change to his trust or estate plan(s) or to make an election under Virginia Lamey's Trust, a hearing must first be held in front of Judge Meade in the Gibson Circuit Court and be subject to approval by the Court. []

(Appellants App. Vol. III, p. 28).

By granting Darvin the right to choose his own counsel, the parties implicitly granted him the corresponding right to hire this counsel. Requiring pre-approval from GAB or Appellants to hire counsel of his choice, would have eroded Darvin's right to choose and interjected a measure of interference by the guardians. It would also have placed Darvin's chosen counsel in the unenviable position to be cautious for a possible future conflict of interest between their client and the parties that had approved counsel's hire. Accordingly, we find that, based on the Agreed Order, ZSWS did not have to engage with GAB separately to negotiate a fee arrangement.[5]

In *Wyneken v. Long*, 400 N.E.2d 1147, 1148 (Ind. Ct. App. 1980), relied upon by Appellants, an adult protected person, already represented by an appointed

---

[5] This would not leave a guardian at the mercy of the fee structure of the ward's counsel, as the guardian can always contest the reasonableness of the incurred fees in a separate petition.

attorney, entered into a contract with an attorney for legal services. When the attorney requested payment for his services from the guardian, the guardian refused reimbursement. *Id*. Upon review, we noted that if the attorney had provided legal services to terminate the guardianship, he would have been entitled to compensation; however, his services were not rendered for that purpose. *Id*. Nonetheless, the *Wyneken* court stated that "the law will allow a recovery against the incompetent's estate for the reasonable value of the necessary services rendered at the request of the incompetent." *Id*. Applying the principle of "necessary services," the court concluded that these did not fall within that definition as the services "did not involve matters of such exigency that guardian approval could not have been obtained before the services were rendered" and most of these "were rendered after an attorney from a legal aid staff had entered an appearance" for the ward. *Id*. Analogizing to *Wyneken*, Appellants now contend that ZSWS's and Dr. Felthous' fee were not necessary as they were not provided in conjunction with Darvin's subsistence, health, comfort, and education, nor were they exigent.

[41] We find *Wyneken* to be inapposite to the particular facts of this case. Through the Agreed Order, establishing the limited guardianship, the parties incorporated estate planning services squarely within the administration of the guardianship and allowed Darvin the limited authority to make a "change to his trust or estate plan(s) or to make an election under the Virginia Lamey's Trust" subject to "approval by the [c]ourt." (Appellants' App. Vol. III, p. 28). As a corollary of Darvin's limited authority in the estate planning realm, it was

incumbent to establish Darvin's testamentary capacity. *See* I.C. § 29-3-9-4.5 (if a guarding lacks testamentary capacity, the guardian over the estate may take certain actions to effectuate estate planning purposes). To that end, ZSWS engaged Dr. Felthous to evaluate Darvin's competency to support his estate planning decisions. Accordingly, as ZSWS's and Dr. Felthous' fee petitions were for services which had been included by express agreement into the guardianship proceedings, the trial court properly ordered payment from the guardianship estate. *See* I.C. § 29-3-9-9.

## B. Kolb

[42] Again contending that estate planning services are not a necessary service in the guardianship proceedings, Appellants dispute the trial court's grant of Kolb's fee petition. Although Kolb was retained to consult with Darvin on his estate plan, prior to establishing Darvin's testamentary capacity[6], we agree with the trial court's perception that "[g]iven the terminal and rapidly progressive nature of Darvin's illness and the protracted nature the litigation took on, it was not unreasonable to seek to have the new estate plan ready to execute should Darvin have been successful in gaining authority to change his estate plan." (Appellants' App. Vol. II, p. 37). For the same reasons we affirmed the trial court's Order with respect to ZSWS's and Dr. Felthous' petitions, we conclude

---

[6] We hasten to point out that nothing in this opinion should be read or constructed to establish the existence or lack of Darvin's testamentary capacity. As emphatically repeated by the trial court several times in its Order, the issue of Darvin's testamentary capacity is not before this court and will not be decided by this court in this appeal.

that the trial court did not abuse its discretion with respect to Kolb's fee petition.

### III. *Appellate Attorney Fees*

[43] ZSWS and Kolb request an award of appellate attorney fees pursuant to Indiana Appellate Rule 66(E), which provides, in pertinent part, "[t]he Court may assess damages if an appeal . . . is frivolous or in bad faith. Damages shall be in the Court's discretion and may include attorney's fees." Our discretion to award attorney fees under Indiana Appellate Rule 66(E) is limited, however, to instances when an appeal is permeated with meritlessness, bad faith, frivolity, harassment, vexatiousness, or purpose of delay. *Thacker v. Wentzel*, 797 N.E.2d 342, 346 (Ind. Ct. App. 2003). While Indiana Appellate Rule 66(E) provides this court with the discretionary authority to award damages on appeal, we must use extreme restraint when exercising this power because of the potential chilling effect on the exercise of the right to appeal. *Id.* A strong showing is required to justify an award of appellate damages, and the sanction is not imposed to punish mere lack of merit, but something more egregious. *In re Estate of Carnes*, 866 N.E.2d 260, 267 (Ind. Ct. App. 2007).

[44] Indiana appellate courts have formally categorized claims for appellate attorney fees into "substantive" and procedural bad faith claims. *Bozcar v. Meridian Street Found.*, 749 N.E.2d 87, 95 (Ind. Ct. App. 2001). To prevail on a substantive bad faith claim, the party must show that the appellant's contentions are arguments are utterly devoid of all plausibility. *Id.* Procedural bad faith, on the

other hand, occurs when a party flagrantly disregards the form and content requirements of the rules of appellate procedure, omits and misstates relevant facts appearing in the record, and files briefs written in a manner calculated to require the maximum expenditure of time both by the opposing party and the reviewing court. *Id.* Even if the appellant's conduct falls short of that which is "deliberate or by design," procedural bad faith can still be found. *Id.*

[45] In support of their procedural and substantive bad faith claims, Kolb points to numerous specific instances ranging from the content of Appellants' arguments to their strategy and purported deficiencies in their Appendices. However, we find that Appellants' challenge is consistent with reasonable advocacy and cannot conclude that they flagrantly disregarded the form and content requirements of the rules of appellate procedure. Although Appellants are ultimately unsuccessful in this appeal, we cannot say that it was permeated in bad faith or litigated with frivolity or vexatiousness. Accordingly, we affirm the judgment of the trial court and deny ZSWS's and Kolb's request for appellate attorney fees.

## CONCLUSION

[46] Based on the foregoing, we hold that while Appellants have standing to pursue this interlocutory appeal of right, the trial court did not abuse its discretion in granting ZSWS's and Kolb's fee petitions and in ordering the payment of the expert witness fees. We deny ZSWS's and Kolb's request for appellate attorney fees.

[47] Affirmed.

[48] Robb, J. and Pyle, J. concur