# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 30 2019, 10:26 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT:
F.B. (MOTHER)

Jennifer A. Joas
Madison, Indiana

ATTORNEY FOR APPELLANT:
J.B. (FATHER)

R. Patrick Magrath
Madison, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine A. Cornelius
Deputy Attorney General

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of K.N.B. (Minor Child),

and

F.B. (Mother) and J.B. (Father),

*Appellant-Respondents,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

April 30, 2019

Court of Appeals Case No.
18A-JT-2567

Appeal from the Dearborn Circuit Court

The Honorable James D. Humphrey, Judge

Trial Court Cause No.
15C01-1802-JT-0011
15C01-1804-GU-21

**Tavitas, Judge.**

## Case Summary

F.B. ("Mother") and J.B. ("Father") appeal the termination of their parental rights to K.N.B. (the "Child"). We affirm.

## Issues

Mother and Father, collectively[1], raise three issues on appeal, which we restate as:

> I. Whether the trial court erred in finding termination of parental rights was in the Child's best interests.
>
> II. Whether the trial court erred in finding the conditions which resulted in removal of the child had not been remedied.
>
> III. Whether the trial court abused its discretion in denying the petition for guardianship.

## Facts

The Child was born in February 2007 to Mother and Father. The Child is the youngest of Mother's three children; however, Father is not the father of Mother's other two children. According to Mother, the Indiana Department of

---

[1] Mother and Father have filed separate briefs in support of their arguments.

Child Services ("DCS") only sought to terminate Mother's parental rights as to the Child and not Mother's other two children.[2]

[4] DCS became involved in the Child's life after learning of Mother's and Father's methamphetamine use, and the Child was removed from Mother and Father in December 2016. Subsequently, DCS filed a petition alleging the Child was a Child in Need of Services ("CHINS") in January 2017. The petition alleged:

> a. Mother has substance abuse issues and on January 6, 2017, she tested positive for methamphetamine on a drug screen administered by DCS.

> b. Due to mother's substance abuse issues she cannot properly care for and supervise the child.

> c. Father knew or should have known of mother's substance abuse issues and allows mother to have unsupervised contact with the child.

Petitioner's Ex. 1.[3] The trial court adjudicated the Child a CHINS on March 6, 2017, removed the Child from Mother and Father, and granted wardship to DCS.

[5] The trial court entered a dispositional order requiring that Mother and Father, among other things: (1) participate in programs that are recommended by the

---

[2] Mother's other two children did not live with Mother at the time of the termination hearing.

[3] Although the CHINS petition did not discuss Father's drug use, the record before us and Father's brief includes evidence that Father also struggled with drug use.

family case manager ("FCM"); (2) maintain "suitable, safe and stable housing" for the Child; (3) not "use, consume, manufacture, trade, distribute or sell any illegal controlled substances"; (4) complete a parenting assessment and complete all recommendations developed as a result of the assessment; (5) complete a substance abuse assessment and complete all recommendations developed as a result of the assessment; (6) submit to random drug screens; (7) attend all schedule visitations with the Child; and (8) follow all terms of probation. Petitioner's Ex. 4.

[6] Mary Wring, a therapist with Community Mental Health Center ("CMHC") served as Mother's mental health therapist for approximately six months. Wring only completed eight sessions with Mother; however, Mother was scheduled to meet with Wring weekly for those six months. Wring testified that Mother denied her substance abuse issues.

[7] Alec Dalton, a therapist with CMHC, worked with Father at the individual outpatient program ("IOP"). Dalton testified that, while Father completed the group portion of the program, Father did not complete his additional individual counseling. He appeared for one session, but he failed to appear for his subsequent appointments in November 2017.[4]

---

[4] Father disputes that this additional individual counseling was required. *See* Father's Br. p. 18. Dalton testified, however, that Father was contacted after his first missed appointment, and a staff member of the IOP called and re-scheduled a second appointment with Father, which Father did not attend. Dalton also testified that he notified Father about the additional individual counseling when Dalton "spoke to [Father] face to face in [the] one-on-one session on October 26th. . . ." Tr. Vol. I p. 24.

[8] On January 20, 2018, Officer Jonathon Kolb with the Aurora Police Department attempted to locate Father at his mother's house because Father had two active arrest warrants. When the officers arrived to arrest Father, they observed scales, baggies, and an orange syringe cap in what appeared to be Father's room. Father then cooperated and helped police locate syringes, additional baggies with a crystal-like substance that officers believed to be methamphetamine, and a green bottle cap with a tan substance officers believed to be heroin. As officers were collecting evidence, Father ran away from the officers. After the officers located Father and transported him to jail, the jail staff found additional items inside Father's pants, including a tablet of buprenorphine, an additional crystal-like substance believed to be methamphetamine, and a tan substance believed to be heroin. At the time of the termination hearing, Father's charges for possession of these items were pending.[5]

[9] On February 28, 2018, DCS filed a petition to terminate the parents' parental rights to the Child. On May 14, 2018, Donald and Debra Campbell filed a motion to intervene regarding guardianship, which the trial court granted. Mother and Father both consented to the Campbells' request for appointment of guardianship.

---

[5] Relatedly, during the underlying CHINS proceeding, the Child was placed with the Father's mother, but was ultimately removed because the Father's mother tested positive for methamphetamine. The Father's mother also, during the January 2018 incident, precluded the officers from further investigation without a search warrant after the officers located Father.

[10] The trial court held a hearing on the termination petition over several days, including April 11, May 15, May 23, July 18, and August 21, 2018. During the May 15, 2018, and May 23, 2018, portion of the termination hearing, the trial court focused on the guardianship petition filed by the Campbells.

[11] Debra testified that, although the Campbells are not related by blood to the Child, the Campbells have "kind of been like grandparents to [the Child] for – since she was about one (1) year old. . . ." Tr. Vol. I p. 39. The Campbells' son is engaged to be married to the Child's aunt;[6] and they have been in a relationship for eleven years, with two children together. Debra testified about the friendship between her grandchildren and the Child and testified that the Child typically visits the Campbells on her breaks from school. Debra testified that she would be financially able to support the Child, and because she and Donald are retired, they would be able to supervise the Child.

[12] Debra also testified that, if she and Donald were granted guardianship, they would try to keep the Child close with the Child's siblings. Debra's son and the Child's aunt have lived on the Campbells' property; however, at the time of the hearing, the Child's aunt was incarcerated. Debra testified that the Child's aunt would be living on the Campbells' property "if she can come home and not use anymore."[7] *Id.* at 52. Both Mother and Father consented to the guardianship

---

[6] At the time of a subsequent hearing in August, Father testified that he believed the Campbells' son and the Child's aunt were "going through a breakup." Tr. Vol. I p. 201.

[7] After Debra's testimony, the Campbells' attorney reviewed the child's aunt's records, and stated that the reason the Child's aunt was incarcerated was due to "just a probation violation, . . . where she failed to

by the Campbells and testified that they wanted the Campbells to be granted guardianship.

[13] FCM Paige Cruey, testified that DCS's policy regarding finding an appropriate family for a child is to first look at "appropriate family members" and if none are "within the appropriate distance or have the appropriate background,"[8] DCS will look elsewhere "as in foster parents." *Id.* at 77. Cruey's understanding of the term "family" was "blood relatives." *Id.* When asked DCS's position on the Campbell's guardianship position, Cruey stated, "[DCS's] proposed permanency plan is adoption. I can't make recommendations at this time on that other than that our proposed permanency plan is adoption. If the Campbells were willing to do adoption, then that's something we could look at or have a viewpoint on."[9] *Id.* at 78.

[14] Cruey also testified that the Child would likely be affected if the Child was not allowed to see her family, but stated that the Child "is still seeing her [siblings] through her current foster placement." *Id.* at 84. The guardian ad litem ("GAL"), Patricia Coghill, stated that the Child considers the Campbells to be

---

maintain employment and not attending counseling." Tr. Vol. I p. 69. The underlying offense, according to the Campbells' attorney, was a 2015 conviction for possession of a narcotic drug, a Level 6 felony.

[8] The FCM did not have any concerns regarding the Child's safety with the Campbells.

[9] The petition for termination states that, on December 21, 2017, the permanency plan changed to reunification, adoption, and guardianship. That same petition, however, listed the satisfactory plan as adoption.

her grandparents.  Coghill's understanding was that the last school break the Child spent with the Campbells was Christmas 2016.

[15] At the end of the hearing on the guardianship petition, the trial court took the petition under advisement.  The trial court denied the Campbells' petition for guardianship on June 20, 2018, concluding "that insufficient evidence has been presented to show sufficient contacts in the relationship between the child and the [Campbells] in order to grant the guardianship petition at this time." Mother's App. Vol. II p. 73.[10]

[16] Returning to July 18, 2018, evidence on the termination petition continued. Cruey testified that the Child had been removed from her parents for approximately nineteen months and that the conditions that led to the Child's removal from the parents had not been remedied.  Cruey also testified that, at no time in her handling of the case, did she ever recommend placement of the Child with either parent due to parents' continued non-compliance[11] with services and parent's continued methamphetamine use.  Cruey testified that services for Mother ended when Mother "stated to [DCS] she no longer wanted to comply with the services."  Tr. Vol. I p. 109.  Cruey also testified that

---

[10] The Campbells later filed a "Motion for Hearing on Renewal of Appointment of Guardian," which the trial court granted on July 16, 2018.  Mother's App. Vol. II p. 74.  The trial court again denied the guardianship petition on September 21, 2018, finding "the lack of relationship and lack of consistent contact over the years make the granting of [the Campbells'] guardianship to not be in the child's best interest.  Id. at 76 (emphasis supplied).

[11] Cruey later testified that Mother and Father were "[s]omewhat compliant" with services.  Tr. Vol. I p. 108.

Mother tested positive for methamphetamine on October 5, 2017, October 10, 2017, and October 18, 2017.[12]

[17] Cruey testified that Mother was offered "home-based case work, CMHC services such as individual counseling for substance abuse, as well as parenting classes and random drug screens." *Id.* at 108. For Father, Cruey testified that he was offered "home-based case work[,] . . . parenting classes, random drug screens, individual counseling and IOP at CMHC." *Id.* Cruey testified that Mother had supervised visits with the Child but that Mother did not attend all the visits. *Id.* at 113. Cruey also stated that Mother was held in contempt of court during the CHINS proceeding for not complying with services.[13]

[18] As to Father, Cruey testified that he was not compliant at the beginning of his home-based case work but that Father was more compliant towards the end of services. Father did complete his parenting education classes. Cruey also testified that Father was incarcerated twice during the CHINS proceeding and that he appeared to be under the influence at one visit with the child, but Father

---

[12] Petitioner's exhibits also show that Mother tested positive for amphetamine and methamphetamine on May 9, 2017, July 10, 2017, September 13, 2017, September 22, 2017, and September 28, 2017; positive for amphetamine, methamphetamine, and THC on March 21, 2017, May 1, 2017, June 26, 2017, July 31, 2017, and August 3, 2017; positive for THC on April 25, 2017, June 20, 2017, June 30, 2017, and July 27, 2017; positive for tramadol on March 31, 2017; and positive for cocaine on March 13, 2017. *See* Petitioner's Ex. 11.

[13] On June 21, 2017, an order on the rule show cause was issued after Mother failed to comply with several services and had "several positive screens for methamphetamine and THC." Petitioner's Ex. 6. Mother also failed to complete her weekly counseling sessions, comply with home-base casework, and either cancelled or did not appear for some of the supervised visits with her children.

refused a drug screening at the visit.[14] Cruey also testified that Mother's and Father's habitual incarceration causes "a big concern for stability." *Id.* at 121.

[19] At the August hearing on the termination petition, there was additional testimony regarding potential guardianship of the Child by the Campbells. Cruey testified that DCS conducted a court-ordered home study with the Campbells to determine if they were an adequate placement for the Child. Cruey testified that she did not have safety concerns with the Campbells' residence as a result of the home study. Shortly before the July portion of the termination hearing, Cruey stated that she asked the Child whether she would want to live with the Campbells or her foster family, and the Child's response was, "I don't know." *Id.* at 139.

[20] At the time of the termination hearing, Father was on probation and had fifteen months of probation remaining. Mother, also at the time of the hearing, was incarcerated in Dearborn County. On September 21, 2018, the trial court entered an order terminating Mother's and Father's parental relationship with the Child. Mother and Father now appeal.

## Analysis

[21] Mother and Father challenge the termination of their parental relationships with the Child. The Fourteenth Amendment to the United States Constitution

---

[14] According to DCS's exhibits, Father tested positive for amphetamine and methamphetamine on February 15, 2017. Petitioner's Ex. 12.

protects the traditional right of parents to establish a home and raise their children. *In re K.T.K. v. Indiana Dept. of Child Services, Dearborn County Office,* 989 N.E.2d 1225, 1230 (Ind. 2013). "[A] parent's interest in the upbringing of [his or her] child is 'perhaps the oldest of the fundamental liberty interests recognized by th[e] [c]ourt[s].'" *Id.* (quoting *Troxel v. Granville,* 530 U.S. 57, 65, 120 S. Ct. 2054 (2000)). We recognize, of course, that parental interests are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *Id.* Thus, "'[p]arental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities by failing to provide for the child's immediate and long-term needs.'" *In re K.T.K.,* 989 N.E.2d at 1230 (quoting *In re D.D.,* 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*).

[22] When reviewing the termination of parental rights, we neither reweigh the evidence nor judge witness credibility. *In re C.G.,* 954 N.E.2d 910, 923 (Ind. 2011). We consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* We must also give "due regard" to the trial court's unique opportunity to judge the credibility of the witnesses. *Id.* (quoting Ind. Trial Rule 52(A)).

[23] Pursuant to Indiana Code Section 31-35-2-8(c), "The trial court shall enter findings of fact that support the entry of the conclusions required by subsections

(a) and (b)" when granting a petition to terminate parental rights.[15] Here, the trial court did enter findings of fact and conclusions of law in granting DCS's petition to terminate Father's and Mother's parental rights. When reviewing findings of fact and conclusions of law entered in a case involving the termination of parental rights, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* We will set aside the trial court's judgment only if it is clearly erroneous. *Id.* A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment. *Id.*

[24] Indiana Code Section 31-35-2-8(a) provides that "if the court finds that the allegations in a petition described in [Indiana Code Section 31-35-2-4] are true, the court shall terminate the parent-child relationship." Indiana Code Section 31-35-2-4(b)(2) provides that a petition to terminate a parent-child relationship involving a child in need of services must allege, in part:

---

[15] Indiana Code Sections 31-35-2-8(a) and (b), governing termination of a parent-child relationship involving a delinquent child or CHINS, provide as follows:

(a) Except as provided in section 4.5(d) of this chapter, if the court finds that the allegations in a petition described in section 4 of this chapter are true, the court shall terminate the parent-child relationship.

(b) If the court does not find that the allegations in the petition are true, the court shall dismiss the petition.

(B) That one (1) of the following is true:

  (i)    The child has been removed from the parent for at least six (6) months under a dispositional decree.

  (ii)   The court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

  (iii)  The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services of a delinquent child.

(C) that one (1) of the following is true:

  (i)    There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

  (ii)   There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii)    The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(D)    that termination is in the best interests of the child; and

(E)    that there is a satisfactory plan for the care and treatment of the child.

DCS must establish these allegations by clear and convincing evidence. *In re V.A.*, 51 N.E.3d 1140, 1144 (Ind. 2016).

Mother and Father essentially raise three issues on appeal. As noted above, Mother and Father have filed separate briefs, and while some of their arguments are similar, their arguments differ in some respects. We address the differences and similarities in our analysis below.

## A. Child's Best Interests

Both Mother and Father argue that it was not in the Child's best interests to terminate their parental rights. In determining what is in the best interests of a child, the trial court is required to look at the totality of the evidence. *See In re A.B.,* 887 N.E.2d 158, 167-68 (Ind. Ct. App. 2008). In doing so, the trial court must subordinate the interests of the parents to those of the child involved. *Id.* at 168. Termination of a parent-child relationship is proper where the child's emotional and physical development is threatened. *In re K.T.K. v. Indiana Dept. of Child Services, Dearborn County Office*, 989 N.E.2d 1225, 1235 (Ind. 2013). A trial court need not wait until a child is irreversibly harmed such that his or her

physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.* Additionally, a child's need for permanency is a "central consideration" in determining the best interests of a child. *Id.*

### i.    Mother

Mother argues that sufficient evidence did not exist to support the conclusion that termination of Mother's parental rights was in the Child's best interests. Specifically, Mother contends that DCS "did not demonstrate why termination of parental rights was in the minor child's best interests as opposed to guardianship by the Campbell[]s." Mother's Br. p. 13. Mother argues that this was problematic because "[t]ermination of parental rights is a last resort when no other options exist. In this case, there were other options." *Id.*

DCS responds that this argument "is an indirect challenge to the plan, which parents allege they are not challenging. . . ." DCS's Br. p. 31. DCS also argues that there was testimony regarding concern for placement of the Child with the Campbells "because of the likelihood Child's Aunt would return to live with [the Campbells' son] and their two children without being cured of her heroin addiction." *Id.* at 33. Finally, DCS argues that the proposed plan for the Child was adoption and that foster parents wanted to adopt the Child. DCS articulates that this was important for the Child because "[a]doption offers a higher level of permanency for [the] child." *Id.*

[29] Sufficient evidence existed to terminate Mother's parental rights. As the trial court articulated, the evidence supports that

> Mother . . . has made no effort to deal with her substance abuse issue and maintain sobriety. The Court found her in contempt of court in August 2017, due to non-compliance with services, and she requested that all services cease in October 2017. Further, she has not seen the child since September 2017.

Mother's App. Vol. II p. 37. Mother "does not argue these particular findings" are erroneous, but instead Mother argues that the possibility of guardianship by the Campbells made termination inappropriate. Mother's Br. p. 16. More specifically, Mother frames guardianship as an alternative to termination.

[30] "On appeal, it is not enough that the evidence might support some other conclusion, but it must positively require the conclusion contended for by the appellant before there is a basis for reversal." *Best v. Best,* 941 N.E.2d 499, 503 (Ind. 2011). Here, the trial court's decision to terminate Mother's parental rights included the trial court's findings and conclusions that Mother's continued drug use, lack of interest in remedying her drug addiction, and lack of interest in complying generally with DCS services warranted termination of her parental relationship with the Child. The trial court also found that a satisfactory placement plan was in place for the Child. The evidence supported those findings.

[31] As Cruey testified, permanency is the key consideration when considering what is best for the Child. *See e.g., K.T.K.,* 989 N.E.2d at 1235. Although the Child

seemingly enjoyed the time she spent with the Campbells, and especially her cousins, the trial court ultimately concluded that the foster parents, through adoption, could provide the permanency that is in the best interests of the Child. Mother's request that we reconsider that conclusion would require us to re-weigh the evidence, which we cannot do. [16]

[32] DCS met its burden with regard to the termination of Mother's parental rights. [17] Mother cannot now attempt to argue that termination was not in the best interests of the Child merely because there was an alternative, but less ideal, plan available for the Child that Mother preferred. The trial court's conclusion was not clearly erroneous.

### ii.    Father

[33] Father also argues that termination was not in the Child's best interests; however, Father's argument appears to focus more on the trial court's final conclusion that termination was in the Child's best interests. Specifically, Father argues,

> Father may not have fully completed or complied with every item on the dispositional order. However, Father has never

---

[16] Mother argues that the Child has expressed some concern with her current placement. While the Child did report that the foster home is loud because "there's a lot of kids in the home" and that the Child "shares a room," we, again, will not reweigh the evidence with regard to the Child's placement. Tr. Vol. I p. 95.

[17] Mother also directs us to certain testimony that "FCM Cruey admitted that it would be emotionally damaging to [the Child] if her parents' rights were terminated." Mother's Br. p. 19. We disagree with that characterization by Mother. Cruey's testimony was instead that, "I think it would affect her if she wasn't allowed to see her family. But I do know there's – she is still seeing her brothers and sisters through her current foster placement." Tr. Vol. I p. 84.

abandoned his relationship with his daughter. Father's consistent visitation with the Child, even while incarcerated, speaks volumes about the nature of his relationship with his child. The fact that every witness recognized how much Father loved his child and how much the Child loved her Father is the best evidence of the Child's best interests. Father and the Child are very well bonded and even the DCS admitted that severing that tie would harm the mental wellbeing of the Child. Beyond maintaining her ties to Father, allowing the parent-child relationship to continue also keeps her connected to her siblings, her cousins, and other family and friends that the record undisputedly showed the Child was deeply connected to.

Father's Br. p. 21. Father also argues that termination was not necessary because "[t]he Child was in a uniquely positive position for a child of parents who are struggling with addiction. Rather than having no good place to go, the Child had an abundance of caring loving adults in her life who wanted to care for and provide for her." *Id.*

[34] To the extent Father makes the same argument as Mother, namely, that the trial court should have granted guardianship to the Campbells rather than terminate Mother's and Father's parental rights, we have already stated that we will not reweigh the evidence. To the extent Father argues that the evidence did not support the termination of his parental right as in the Child's best interests, we disagree.

[35] The trial court concluded that,

> Father . . . has made minimal effort to address his own substance abuse, and he continues to be involved in criminal activity. He

was arrested for a probation violation, as well as faced new criminal charges for possession [offenses]. The evidence suggests that the only reason father is participating in services is because he is on probation. Based upon father's long history of noncompliance, the Court does not believe that father will continue his current compliance into the future and be able to parent his child.

Mother's App. Vol. II pp. 37-38. The evidence supports these conclusions. Father's continued substance use has been a long standing problem for Father. When Father had custody of the Child, they lived with Father's mother, who also tested positive for methamphetamine. Father's most recent arrest for drug use was January 2018, which was just five months before the termination proceedings began. Based on the evidence presented at the termination proceeding, we cannot say that that the trial court's conclusion was clearly erroneous.

### B. Reasons for Removal

[36] Father challenges the trial court's conclusion that the reasons for the Child's removal were not likely to be remedied and, in fact, argues that the reasons for the Child's removal had already been remedied.[18] Specifically, Father argues

---

[18] Mother does not argue this point, and instead concedes "that the [DCS] proved by clear and convincing evidence that there is a reasonable probability that the condition that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied, . . ." Mother's Br. p. 15. We, therefore, only address whether the conditions that led to removal were remedied as to Father.

the evidence shows that "Father has made substantial progress and shows a high likelihood of continuing to make such progress." Father's Br. p. 20.

[37] As it relates to Father, the trial court found that the conditions that resulted in the Child's removal would not be remedied due to the following:

* * * * *

i. Father was not compliant with services throughout the case. Father did not become compliant with home based casework until July 2017. He was participating in parenting classes through probation and attended most of his visits with the child. Father only submitted to nine (9) drug screens for the Department, one (1) of which came back positive for methamphetamine and amphetamine. (Exhibit 12) Father did not submit to any other drug screens for the Department, but did submit to drug screens for probation.

j. Father attended individual counseling and IOP through Community Mental Health Center with Alec Dalton. Mr. Dalton was father's therapist, specifically working with him as a group leader and individual counseling with IOP. Father was recommended to participate in IOP for an addiction to heroin, and he did complete the group counseling. Mr. Dalton recommended that father complete additional individual counseling sessions, which did not occur. Mr. Dalton only met with father once, and father no-showed to two (2) additional appointments.

k. Officer Kolb with the Aurora Police Department arrested father in January 2018. At that time, father was charged with a variety of possession charges, which included possession of illegal substances.

l. Father was recently released from incarceration and is currently on probation with Donna Harman through Community Corrections. His previous probation officer, Karissa Simpson, worked with father from October 2017 to January 2018, when he was arrested. She was supervising him for Hamilton County, Ohio, where he was ordered to participate in Nurturing Fathers and submit to random drug screens. His drug screens were random, and he submitted to fifteen (15), all of which were negative for illegal substances. He did test positive for alcohol in September 2017, which violated his probation.

Mother's App. Vol. II pp. 36-37.

[38] "In determining whether 'the conditions that resulted in the [Child's] removal . . . will not be remedied,' we 'engage in a two-step analysis.'" *In re E.M.,* 4 N.E.3d 636, 642-43 (Ind. 2014) (quoting *K.T.K. v. Indiana Dep't of Child Servs.,* 989 N.E.2d 1225, 1231 (Ind. 2013)). "First, we identify the conditions that led to removal; and second, we 'determine whether there is a reasonable probability that those conditions will not be remedied.'" *Id.* In analyzing this second step, the trial court judges the parent's fitness "as of the time of the termination proceeding, taking into consideration evidence of changed conditions." *Id.* (quoting *Bester v. Lake Cty. Office of Family & Children,* 839 N.E.2d 143, 152 (Ind. 2005)). "We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination." *Id.* "Requiring trial courts to give due regard to changed conditions does not preclude them from finding that parents' past behavior is the best predictor of their future behavior." *Id.*

[39] The Child was removed from Mother's and Father's care because of drug use, and Father's knowledge of Mother's drug use. The evidence supports the fact that Mother and Father continue to abuse drugs. Father also did not comply with services, including missing counseling appointments, during the CHINS proceeding. While Father has made some improvement by more regular participation in certain services, Father was arrested on drug charges in January 2018—shortly before the hearing on the termination of parental rights. Relatedly, there was testimony that Father's recent improvements with regard to complying with the drug screening requirements may have more to do with Father's probation status. Father did not take this same approach of compliance while the Child was adjudicated a CHINS.

[40] We note that Father, later in his brief, when arguing in favor of guardianship, states: "The need for a non-parental caregiver is self-evident in this matter. Father does not deny his history of drug addiction nor his need for Petitioners to provide respite care. Thus, the necessity of a guardianship here is all but a foregone conclusion." Father's Br. p. 22. Father also testified during the trial that he "need[s] to get [himself] together anyways." Tr. Vol. I p. 63. By Father's own account, it appears that Father acknowledges that his drug addiction is an ongoing battle that has not yet been remedied. The trial court's conclusion that there is a reasonable probability that the conditions that resulted in the Child's removal will not be remedied is, accordingly, not clearly erroneous.

## C. Denial of Guardianship Petition

[41] Father also argues that the trial court abused its discretion in denying the Campbells' guardianship petition.[19] Father argues that the "DCS policy is to seek out family placement before placing a child in foster care." Father's Br. p. 22. Father claims, however, that "DCS never considered any other placement prior to filing for termination in this matter[,]" despite Father's consent and request that the Campbells be granted guardianship. *Id.* Father claims this was an abuse of discretion because "[t]he record was replete with evidence leading to the inexorable conclusion that" the Campbells "were qualified persons most suitable and willing to serve." *Id.* at 23.

[42] DCS argues, and we agree, that Father does not have standing to appeal the denial of the Campbells' petition for guardianship. "Standing is a fundamental, threshold, constitutional issue that must be addressed by this, or any, court to determine if it should exercise jurisdiction in the particular case before it." *Matter of Guardianship of Lamey,* 87 N.E.3d 512, 522 (Ind. Ct. App. 2017) (citing *Alexander v. PSB Lending Corp.*, 800 N.E.2d 984, 989 (Ind. Ct. App. 2003), *trans. denied*). "To have standing, a party's 'interest must be a present, substantial interest, as distinguished from a mere expectancy or future contingency interest.'" *Lamey,* 87 N.E.3d at 522 (quoting *Inlow v. Henderson, daily, Withrow & DeVoe*, 787 N.E.2d 385, 395 (Ind. Ct. App. 2003), *reh'g denied, trans. denied*)

---

[19] Mother does not make this argument separately in her brief.

(internal citations omitted). *See also J.R.W. ex. rel. Jemerson v. Watterson,* 877 N.E.2d 487, 490 (Ind. Ct. App. 2007) ("The standing requirement assures that litigation will be actively and vigorously contested, as plaintiffs must demonstrate a personal stake in the litigation's outcome and must show they have sustained, . . . a direct injury as a result of the defendant's conduct") (internal citations omitted).

[43] Although Father was in support of the Campbells' guardianship, and consented to guardianship by the Campbells, he cannot appeal the denial of the Campbells' petition. Even if Father had standing, we reject his arguments for the reasons stated above with regard to the Child's best interests.

## Conclusion

[44] The trial court's conclusion that termination of Mother's and Father's parental relationship was in the Child's best interests was not clearly erroneous. The trial court's conclusion that the conditions that led to the Child's removal were not likely to be remedied was also not clearly erroneous. Finally, Father lacked standing to argue that the trial court abused its discretion in denying the Campbells' petition for guardianship. We affirm.

[45] Affirmed.

Crone, J., and Bradford, J., concur.